Rowe B. Metcalf and Louise A. Metcalf v. Commissioner.
Metcalf v. Commissioner
Docket No. 87563.
United States Tax Court
T.C. Memo 1963-277; 1963 Tax Ct. Memo LEXIS 71; 22 T.C.M. (CCH) 1402; T.C.M. (RIA) 63277; October 7, 1963
*71 1. Petitioners incurred sizeable losses over a number of years in the operation of a farm used for dairying and raising purebred herds of cattle for breeding purposes. Held, the operation of the farm was a business and the losses incurred therefrom in 1956 and 1957 were deductible. 2. Clerical and accounting expenses incurred in petitioner's New York office were deductible. 3. Deduction for sales tax claimed on returns denied for lack of proof. Cecil Browne, 30 Broad St., New York, N. Y., for the petitioners. Eugene L. Wilpon, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1956 and 1957 in the respective amounts of $26,278.97 and $14,711.12. The issues for decision are: (1) Whether *72 Rowe B. Metcalf, who will hereafter be referred to as petitioner, was engaged during the years 1956 and 1957 in the business of farming so that losses incurred by him in the operation of a farm during those years are deductible by him; and (2) Whether petitioner is entitled to deduct the amounts of $5,582.77 in 1956 and $6,470.26 in 1957, representing accounting and clerical expenses. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife. They filed their joint Federal income tax returns for the years 1956 and 1957, on a calendar year basis and by the cash method of accounting, with the district director of internal revenue, Lower Manhattan District of New York. Petitioner was engaged in the family woolen business, in the New England area, from 1925 until the business was sold in 1955. In 1923 or 1924 he purchased a farm near Beaufort, N. C., on which he raised corn, beans, lespedeza, and some beef cattle. This farm was too far from petitioner's place of business and his home so he sold the farm after about 7 years. In 1932 petitioner considered buying and building up a dairy farm in Connecticut and he sought *73 the assistance of George DeVoe (hereafter referred to as DeVoe), a realtor familiar with farms in Litchfield County, Conn. In 1932 and 1933 he purchased several contiguous operating dairy farms in Litchfield County encompassing about 1,700 acres in area. Subsequently, he acquired about 300 additional acres. He considered other areas but decided to buy the property which he did because it had what he considered to be good fields, an ample water supply from a stream which ran through the property, and because it was served by a railroad by which he could ship feed for cattle. Before buying the property petitioner inquired of a leading seller of certified milk as to whether it would buy his production of certified milk if he were to establish a dairy farm. He was told that all of his production would be purchased. He also visited the farm of a leading producer of certified milk to get advice about what he would need for a successful dairy. Certified milk, which was then popular, was produced under very hygienic conditions, was bottled at the dairy, and was expensive to produce. Petitioner built four 50-cow milking barns, a calf barn, a bull barn, and other small outbuildings and began *74 his dairy with 50 Ayrshires, 50 Jerseys, and 100 Brown Swiss. He found that the Ayrshires were hard to handle and that Jersey calves were delicate and that the Brown Swiss were the most practical breed to maintain as good producers, so he began gradually to build up the herd of Brown Swiss, keeping a few Jerseys to maintain a high butterfat content for his milk. Petitioner, whose residence was in Greenwich, Conn., in 1932, did not manage the farm himself; he employed a farm manager. His annual income at the time he bought the farm was about $250,000 from his woolen business and investments. Petitioner's first farm manager proved unsatisfactory and the second left after a short time. Petitioner considered DeVoe a good chemist, which would be helpful in producing certified milk, and able, and in October 1932 he offered DeVoe the manager's job at a salary of $200 per month, together with a house, plus three-fourths of the net profit of the farm up to $8,000 per year, after which petitioner would take three-fourths of the net profits and DeVoe one-fourth. DeVoe accepted the job, and although he owned a 280-acre dairy farm at the time, he devoted all of his time and attention to managing *75 petitioner's farm, which was known as Judd's Bridge Farms. The dairy which petitioner contacted and which had promised to purchase his entire production failed to take all of petitioner's certified milk as certified milk. Had petitioner been able to sell his milk as certified milk he would have received 15 or 16 cents a quart for all of his production, which reached 1,800 to 2,000 quarts a day, but he was able to sell only about 300 quarts as certified milk. The balance was sold in bulk for 3 cents a quart. Later he was able to increase the price he received for his milk by selling in bulk to schools and hospitals for 12 cents a quart and by establishing a milk route and selling bottled milk for 28 cents a quart. He was able to sell some 600 quarts a day on the milk route. After petitioner began his dairy operations the demand for certified milk fell off because of advances in the methods of milk production which enabled the farmer to produce safe milk without going to the expense of producing certified milk. Although the demand for certified milk decreased, the cost of labor and feed increased steadily during the period petitioner was building up his Brown Swiss herd. From 1932 *76 to 1947 the cost of grain rose from $28about per ton to about $108 per ton, and labor costs went from $72- $75 a month per man to $180 per month per man. During this period petitioner attempted to increase his milk production by improving his herd by breeding. He succeeded in doing so and during the 1940's the average production per cow in the Brown Swiss herd was 12,800 pounds per year, which was a good record. One purpose for building up a herd of cattle is to develop animals of high production and desirable type so that the animals can be sold to other breeders who are trying to improve their herds, and the milk production record that is achieved while building up a fine herd of dairy cattle adds to the reputation of the herd. It is not practical when building up a dairy herd to separate the breeding operations from the milk-selling operations, since the cattle must be milked in any event and the milk would be wasted if it were not sold. Although petitioner did not make his operations profitable by selling milk, if he had not sold milk his losses would have been larger. In a breeding operation it takes approximately 7, years to prove one bull and it takes about 15 years to build *77 up a successful breeding operation. While a herd is being built up it is not advisable to sell many of the good animals because it is advisable to retain those with desirable characteristics. Losses must be expected while a herd is being built up. Petitioner advertised his Brown Swiss cattle in trade journals and exhibited his cattle at shows. His herd had a good reputation and by 1947 he had succeeded in building up an excellent herd of Brown Swiss, which at a dispersal sale in 1947 brought a higher average price per animal than had ever been received at a Brown Swiss dispersal sale up to that time. During the years 1932-1947, petitioner received gross income from the operation of the farm in the amount of $1,103,665, and incurred expenses, including depreciation, of $1,649,296. He suffered a loss from the operation of Judd's Bridge Farms in each of the years 1932 through 1947. However, proceeds from the dispersal sale of the Brown Swiss herd in 1947 amounted to $202,668.33 and petitioner realized a profit therefrom of $124,312.47. The foregoing figures for gross income for the period 1932-1947 do not include the proceeds from the dispersal sale in 1947. Petitioner sought the *78 advice of experts in trying to make his farm profitable and one expert, Carl B. Bender, visited the farm in 1937. Bender was a professor of animal husbandry and a dairy research specialist at the New Jersey Agricultural Experimentation Station, New Brunswick. Bender did consulting work for farmers but only if they were interested in operating their farms efficiently, and he did not offer his advice to any farmers except those who were attempting to operate at a profit. Bender met petitioner as a member of the New York Farm Club, and he knew that petitioner was concerned about the losses he was sustaining on Judd's Bridge Farms. In 1937 Bender visited Judd's Bridge Farms and advised petitioner as to a method for putting up hay as grass silage. At that time petitioner had a milking parlor and Bender suggested to petitioner that his dairy losses could be reduced by eliminating the milking parlor. Petitioner followed Bender's advice. Petitioner consulted Bender again in 1947 at a time when petitioner was again worried about his farm losses. Bender knew that the problems at Judd's Bridge Farms were becoming burdensome to petitioner and he suggested that the Brown Swiss herd be sold. Again *79 petitioner followed Bender's advice and sold the herd in 1947. After the dispersal sale petitioner retained four or five of his Brown Swiss and commenced to build up a new, smaller herd and also began to build up an Angus beefbreeding herd. Angus were popular at the time and the cattle market was high. DeVoe retired as manager at the end of 1947 and Howard Sleighter (hereafter called Sleighter), a former farm employee of petitioner's, became manager. A beef-breeding operation is very different from a dairy-breeding operation in that it requires less shelter, less labor, and less sanitation, and, therefore, is less expensive. A change from one breeding operation to the other involves a change in the type of operation. After 1947 the price paid for cattle, including Angus, fell off, and petitioner continued to incur losses in the operation of Judd's Bridge Farms. In June 1951 petitioner retained Doane Agricultural Service to prepare for him a management report on the operation of his farm. At that time there were 35 head of dairy cattle, 104 head of beef cattle, and 6 saddle horses on the property; some 226 acres of land were subject to cultivation and 214 acres were permanent pasture. *80 Five hundred tons of silage could be stored as well as 248 tons of hay; and the personnel on the farm consisted of a crew of seven men and extra help hired as needed for special work. The Doane Agricultural Service submitted a report which recommended the construction of an additional silo; house repairs for some seven dwellings on the property in order that they might be rented; the exhibition of cattle only at local shows and sales to be promoted primarily by production records; a beef heard of 170 head and a dairy herd of about 42 head; and the possible purchase of another farm, preferably in the corn belt. It was predicted that at the anticipated level of prices (which were lower than the current level for Angus breeding stock) the estimated annual income of the farm should be about $55,000 and that estimated expenses, which were expected to increase for a period, would be $57,000, including depreciation, but it also noted that income of the farm could be increased if all breeding stock could be sold at current values. Petitioner followed many of the recommendations of the Doane Agricultural Service but did not purchase an additional farm as suggested. In 1955 a devastating flood, *81 the worst in the area in many years, caused great damage to petitioner's buildings, feed, and pasture lands. The drop in Angus prices, the increase in costs and, more immediately, the damage caused by the 1955 flood, made petitioner decide to sell his Angus herd, which he did in 1955 and 1956. However, petitioner had not expected to build up a profitable Angus breeding operation in the period from 1948 to 1955 because he knew it would take 10 to 15 years to build up a profitable breeding herd. During the years that petitioner was building up his Angus herd and his smaller Brown Swiss herd, he continued to sell his milk in bulk to a local dairy. During these years, 1948-1955, petitioner realized gross income from the operation of Judd's Bridge Farms in the total amount of $241,476, incurred expenses, including depreciation, of $544,327, and suffered losses totaling $302,851. He incurred a loss in each of the years 1948-1955. Prior to the flood in 1955 petitioner had become interested in a breed of beef cattle known as Charolaise, and because of the drop in popularity and prices of Angus beef cattle and certain characteristics of the Charolaise, he had considered switching from Angus *82 to Charolaise. This was a breed of French cattle, then relatively new in this country, noted for their ability to put on weight quickly at low cost. The popularity of Charolaise has increased in later years, both because of their ability to gain weight quickly and because of a lower fat content in the meat. Petitioner's attention was called to this breed by an article appearing in the winter of 1954 issue of Farm Quarterly. He discussed the matter with Sleighter who was sent to Texas in order to investigate the breed at a ranch where one of the few herds of Charolaise was maintained in this country. Petitioner started off his Charolaise herd in 1955 and 1956 by purchasing 11 animals at a cost of $5,000 each. And about 2 years later he purchased about 8 more animals at the same price. All of these animals were registered. In 1955 petitioner decided that he should fully utilize a certain dairy barn that was not being used to capacity because he believed full utilization would be more efficient. Petitioner consulted the operator of a Brown Swiss dairy in Wisconsin about the acquisition of additional Brown Swiss animals and petitioner went to Wisconsin and spent 10-12 days there picking *83 out animals for his purchase. The owner of the Brown Swiss herd in Wisconsin had formerly been petitioner's herdsman, Magnussen, and was familiar with Judd's Bridge Farms. He agreed with petitioner that building up the Brown Swiss herd at Judd's Bridge Farms in order to fully utilize the dairy barn was reasonable. In 1960, after having operated the Charolaise breeding venture for 4 to 5 years and having built up his Brown Swiss herd to the point where the dairy barn was being fully utilized, and still not being able to show a profit from Judd's Bridge Farms, petitioner decided to sell all of his animals and retire from the cattle business completely. By agreement dated December 30, 1960, petitioner sold his Charolaise herd to Sleighter for $110,000. The herd had a book cost of $95,791.81. Under the agreement of sale, which also included the sale of one of petitioner's farms for $40,000, Sleighter paid $50,000 down and agreed to pay $20,000 per year with interest at 6 percent. To raise the original downpayment of $50,000, Sleighter had to raise $33,000 on the cattle which he was buying from petitioner. At the time of trial, one installment had become due and it had been paid by *84 Sleighter. He had also paid the required interest. In addition, the agreement of sale gave Sleighter the use of the barns in exchange for his keeping them in repair and paying the taxes on them. Sleighter operated the herd he acquired from petitioner on the same land and in the same barns petitioner had used. In 1961 Sleighter realized a profit of about $8,000 before depreciation but incured a loss of about $8,000 taking depreciation into account. In 1962 Sleighter lost about $1,000 before considering depreciation, and about $14,000 after depreciation, but he sold some animals in 1962 for which he was paid early in January 1963 and this payment resulted in a profit of $23,170. Sleighter's only sources of income were from his Charolaise operation, a salary of $3,600 per year from petitioner, and $1,500 from other sources. In the spring of 1961 petitioner sold his Brown Swiss herd at a dispersal sale. During the years that petitioner operated his Charolaise herd, 1956-1960, petitioner realized gross income from the operation of the farm in the amount of $232,661 and he incurred expenses, including depreciation, of $447,893 and incurred a loss totaling $215,232. He incurred a loss *85 in each of the years 1956-1960. Petitioner made his personal residence on a portion of his farm after 1951 when he reconstructed a house which he had built in Massachusetts. Before moving to the farm to live, petitioner stayed at a small five-room house when he visited the farm. During the years in question he spent on the average of 4 days a week on the farm. The cost of acquisition and improvements to petitioner's residence was $172,790.99. The residence is about 1 mile from the cattle barns and with other nonfarm buildings, including a guesthouse, a garage, and a horse barn, is located on about 10 acres of land. Petitioner did some horseback riding before 1950, and in 1951 there were six saddle horses on the farm. In 1956 and 1957 petitioner maintained only one horse which he did not ride. Petitioner did very little entertaining at the farm and when petitioner had guests it was usually only one other couple. Petitioner hunted and fished on the farm in season and he stocked the steam which ran through Judd's Bridge Farms at a small cost. The farm accounts and petitioner's personal accounts were kept completely separate. A monthly statement was prepared showing the work done by *86 each of the farm employees and, to the extent it was for petitioner or his family, petitioner was charged for it personally. Similarly, he was charged for the milk and gasoline he and his family used at the farm and none of his or his family's expenses were paid from the farm account. Until 1946 petitioner's losses from the operation of Judd's Bridge Farms, plus his living expenses, were covered by other income which he received. But beginning in 1946 he was required to use capital to support his farm operations and his total expenditure of capital approximated $800,000. A separate capital account representing petitioner's investment in the farm was maintained on petitioner's books and on the books of the farm. While petitioner was carrying on his cattle-breeding operations and the dairy, he took an active part in directing the farm. He continuously discussed the problems of management of the farm with DeVoe and later with Sleighter; and he made final decisions and participated directly in the selection of cattle. Balance sheets for Judd's Bridge Farms at December 31, 1956, and December 31, 1957, were as follows: JUDD'S BRIDGE FARMS
Balance Sheet as at December 31, 1956
CURRENT ASSETS: Cash
$ 1,084.33
Petty cash
428.05
Accounts receivable
Advances employees
315.15
Cattle (Brown Swiss)
$33,232.84
(Charolaise)
95,381.81
(Black Angus)
500.00
129,114.54
$130,942.18
FIXED ASSETS: Land
$ 47,237.14
Trees
12,024.98
Buildings
270,161.52
Improvements (1)
6,356.45
Improvements (2)
2,110.18
Farm machinery & rolling stock
58,092.65
Farm tools
43.44
Irrigation equipment
3,992.19
Fencing
2,968.64
Dairy machinery
7,418.35
Heating system
2,729.86
Dairy tools
Bottles & Caps
268.00
Fire apparatus
4,453.32
Office fixtures
637.05
$418,493.77
Less reserve for depreciation
$126,834.87
$291,658.90
DEFERRED EXPENSE: Deferred charges
$ 948.14
Storeroom
453.31
$ 1,401.45
TOTAL ASSETS:
$424,002.53
LIABILITIES: Accounts payable
$ 2,204.67
Insurance accrued payable
73.74
Taxes withheld F.I.C.A.
95.05
$ 2,373.46
NET WORTH: R. B. Metcalf investment
$454,050.12
(32,421.05)
$421,629.07
JUDD'S BRIDGE FARMS
Balance Sheet as at December 31, 1957
CURRENT ASSETS: Cash
$ 17,788.59
Cash - farm
802.72
$ 18,591.31
Accounts receivable
2,699.96
Advances employees
216.74
Cattle: Brown Swiss
44,771.84
Charolaise
91,441.81
136,213.65
$157,721.66
FIXED ASSETS: Land
$ 47,886.01
Buildings
251,546.68
Trees
11,818.48
Improvements (1)
6,602.98
Improvements (2)
2,110.18
Farm tools
166.47
Farm machinery
59,571.69
Irrigation equipment
3,992.19
Fire apparatus
4,453.32
Fencing
3,362.55
Heating systems
2,729.86
Dairy machinery
8,870.35
Bottles & cases
268.00
Office equipment
637.05
$404,015.81
Less reserve for depreciation
133,545.09
$270,470.72
DEFERRED CHARGES & OTHER ASSETS: Prepaid expense
$ 1,185.33
Storeroom
3,522.91
Notes receivable
4,500.00
$ 9,208.24
TOTAL ASSETS:
$437,400.62
LIABILITIES
Accounts payable
$ 5,284.07
Insurance accrued payable
313.74
F.I.C.A. payable
119.51
Suspense
390.52
Prepaid rent
47.50
$ 6,155.34
NET WORTH: Rowe B. Metcalf capital
$494,319.07
R. B. Metcalf drawing a/c
3,828.78
$490,490.29
59,245.01
$431,245.28
TOTAL LIABILITIES AND CAPITAL
$437,400.62
*87 Petitioners reported adjusted gross income for 1956, other than from the farm, in the amount of $83,615.87 and they reported a loss from the operation of Judd's Bridge Farms of $54,067.33. For 1957 petitioners reported adjusted gross income, other than from Judd's Bridge Farms, in the amount of $81,747.98 and a loss from the farm in the amount of $59,245.01. They attached to their return for 1956 the following profit and loss statement for the farm for the taxable year 1956: JUDD'S BRIDGE FARMS
PROFIT AND LOSS STATEMENT FOR
PERIOD OF ONE YEAR ENDING
DECEMBER 31, 1956
INCOME: Sales Milk
$15,803.64
Rent Income
3,855.00
Profit Sales Brown Swiss
1,002.75
Profit Sales Angus
295.20
Profit Sales Charolaise
9,980.00
Profit Inventory Cattle
1,264.00
Sales Miscellaneous
1,886.57
Government A. C. Program
2,115.15
Government Flood Relief
3,043.50
Total Operating Income:
$39,255.81
Farm Expense (Sch. I)
$22,422.17
Dairy Expense (Sch. II)
16,637.88
Charolaise Expense (Sch. III)
6,247.91
Maintenance Expense (Sch. IV)
8,772.56
Management Expense (Sch. V)
25,596.87
Total Operating Expense:
$79,677.39
Operating Loss:
$40,421.58
Depreciation
13,807.93
$54,239.51
Discount Earned
172.18
Net Business Loss:
$54,067.33
Items subject to Capital Gains treat-
ment
$21,646.28
Net Loss to Owner
$32,421.05
*88 They attached to their return for 1957 the following profit and loss statement for the farm for the taxable year 1957: JUDD'S BRIDGE FARMS
PROFIT AND LOSS STATEMENT FOR PERIOD OF ONE YEAR ENDING DECEMBER 31, 1957
Year
Year
Increase
1957
1956
or Decrease
INCOME: Sales Milk
$22,933.11
$15,803.64
$ 7,129.47
Rent Income
3,100.85
3,855.00
754.15
Profit Sales Brown Swiss
1,029.67
7,367.76
6,338.09
Profit Sales Charolaise
5,000.00
9,980.00
4,980.00
Profit Sales Angus
512.24
295.20
217.04
Profit Inventory Cattle
2,705.00
1,264.00
1,441.00
Sales Miscellaneous
1,511.77
1,886.57
374.80
Flood relief payments
5,158.65
5,158.65
TOTAL OPERATING INCOME:
$36,792.64
$45,610.82
$ 8,818.18
OPERATING EXPENSE: Farm Expense (Sch. I)
$20,740.76
$22,422.17
$ 1,681.41
Dairy Expense (Sch. II)
22,665.10
16,637.88
6,027.22
Charolaise Expense (Sch. III)
7,301.10
6,247.91
1,053.19
Maintenance Expense (Sch. IV)
4,948.80
8,772.56
3,823.76
Management Expense (Sch. V)
19,921.46
25,596.87
5,675.41
TOTAL OPERATING EXPENSE:
$75,577.22
$79,677.39
$ 4,100.17
Operating Profit
$38,784.58
$34,066.57
$ 4,718.01
Depreciation & Non-Operating Exp.
20,603.85
21,071.43
467.58
$59,388.43
$55,138.00
$ 4,250.43
Non-Operating Income (Sch. VII)
143.42
22,716.95
22,573.53
NET PROFIT:
$59,245.01
$32,421.05
$26,823.96
*89 During the years 1956 and 1957 petitioner and his brother maintained an office in New York City for the transaction of their own and their families' financial business including the management of various family trusts. Petitioner paid 40 percent and his brother 60 percent of the expenses of the office. The office staff consisted of two accountants and a secretary, one accountant working for each brother and the secretary working for both of them. Petitioner spent about 5 percent of his time while in his New York office on farm matters and the accountant working for him and the secretary spent about 15 and 10 percent of their time, respectively, on farm matters. The financial interest of petitioner and his family exceeded $6 1/2 million. During 1956 and 1957 petitioner spent about 3 days a week in the New York office which was closed on Saturday and Sunday. He did not consider the work involved in taking care of the finances for himself and his family a full-time job. For 1956 petitioners claimed deductions in the amount of $10,259.36 for the expenses of operating the New York office, which expenses were the amount apportioned to taxable income. Such deductions claimed for 1957, *90 apportioned to taxable income, amounted to $11,607.77. In both years the accounting and clerical expenses were deducted from adjusted gross income on petitioners' return. Ultimate Facts Petitioner was engaged in the business of operating a farm during the years 1956 and 1957 and is entitled to deduct the losses therefrom. All of the expenses claimed by petitioner for the accounting and clerical expenses of operating the office in New York City were incurred in petitioner's business or for the production of income or for the maintenance and conservation of income-producing property. These expenses are deductible from adjusted gross income as claimed in each of the taxable years 1956 and 1957. Opinion The principal issue is whether petitioners were entitled to deduct the losses from the operation of Judd's Bridge Farms in 1956 and 1957. This depends on whether the operation of the farm in those years constituted a trade or business of petitioner within the purview of section 162 of the 1954 Code. [1] This is a question of fact to be decided on the evidence presented, and the intention of the taxpayer is paramount. Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, *91 1949), affirming a Memorandum Opinion of this Court, certiorari denied 338 U.S. 828 (1949); Norton L. Smith, 9 T.C.0 1150. Dairy farming and cattle breeding may constitute a business. Margaret E. Amory, 22 B.T.A. 1398 (1931); George D. Widener et al., 8 B.T.A. 651 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929). But the intent to operate such a farm as a business must include a motive to make a profit on the operation. Theodore Sabelis, 37 T.C. 1058 (1962); Dean Babbitt, 23 T.C. 850 (1955). If a taxpayer operates a farm on a commercial basis with a true intention of eventually making a profit, and not merely for recreation and pleasure, he may deduct all amounts actually expended in carrying on the business of farming. Sec. 1.162-12, Income Tax Regs. Thus petitioner must show that he operated Judd's Bridge Farms in 1956 and 1957 as a business with a genuine intention of earning a profit. Dupont v. United States, 28 F. Supp. 122 (D. Del. 1939). *92 Based on the facts which we have outlined in some detail in our Findings of Fact and on the testimony of the witnesses presented, which space will not permit us to recount, we have found as an ultimate fact that petitioner's operation of the farm in 1956 and 1957 did constitute a business, and that finding is dispositive of this issue. The only fact shown by the evidence which we think supports respondent's determination that the farm was operated as a hobby rather than as a business is that petitioner incurred losses on the farm every year in which he operated it, from 1932 to 1960 or 1961 (a period of 24 years prior to the years here involved), and the magnitude of those losses. However, a long series of losses, while undoubtedly a very material factor for our consideration in this case, does not of itself make a hobby out of a business. Marshall Field, 26 B.T.A. 116 (1932), affd. 67 F. 2d 876 (C.A. 2, 1933); Thacher v. Lowe, 288 F. 994 (S.D.N.Y. 1922); Dean Babbitt, supra; Norton L. Smith, supra. This factor must be considered *93 with all other factors which are indicative of the taxpayer's intent, including his conduct with respect to those losses and his efforts to make the farm operation profitable. See American Properties, Inc., 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958). Petitioner testified unequivocally that he entered into the farming business with the intent and expectation of eventually making a profit and that each time he changed his herd he did it for this reason and with this hope and intent. Petitioner's testimony as to his intention is not conclusive and may be rebutted by circumstances which are inconsistent therewith but it should not be ignored when it is consistent with other proved facts. See Foran v. Commissioner, 165 F. 2d 705 (C.A. 5, 1948), reversing a Memorandum Opinion of this Court. Consistent with petitioner's testimony was the testimony of petitioner's two former farm managers, DeVoe and Sleighter, and his former herdsman, Magnussen, all of whom testified that the farm was run in a businesslike manner with petitioner constantly trying to increase the income and cut the costs of operation. Also consistent was the testimony *94 of Bender, an expert whom petitioner consulted in 1937 and again in 1947 for advice on how to increase his production and cut his costs, the testimony of Bailey, of Doane Agricultural Service which petitioner employed in 1951 to study his situation and make recommendations on how the farm could be operated more efficiently, and the testimony of Cohon, a successful cattle farmer who sold petitioner the Charolaise cattle with which he started his Charolaise herd in 1955 and 1956. All of these witnesses, none of whom were related to petitioner or presently employed by him, and all of whom were well qualified in the field, testified that the farm appeared to be operated as a business venture, it was not a showplace, petitioner seemed concerned and anxious to make the operation profitable, and in their opinions he had a reasonable expectation of doing so. The testimony of these witnesses was convincing and fully supported petitioner's testimony. Respondent offered no evidence to rebut it. Furthermore, petitioner adopted most of the recommendations of the experts in an effort to make the farm operation profitable. The evidence would indicate that petitioner may have been too impatient *95 to make a profit and too concerned about his losses. Raising a breeding herd is a risky business and takes considerable capital and time to develop. The evidence indicates that it normally takes about 15 years to build up a breeding herd, and that to do it properly the better animals that would sell for more should not be sold until the herd is developed. Petitioner started in the dairy farming business and to raise a breeding herd of Brown Swiss in 1932. Fifteen years later in 1947, he had developed a top grade breeding herd but, discouraged by the decline in the milk business and his sizable losses, he sold practically the entire herd at a considerable profit. He decided that raising a beef-breeding herd was less expensive and would be a better business, so he began to build a breeding herd of Angus cattle, which were popular at the time and bringing high prices, retaining only enough Brown Swiss to utilize the dairy equipment and service his local milk market. Unfortunately, the popularity of Angus and the price of beef both feel off not long after he started this phase of his farming operation. In 1951 he brought in farm specialists to analyze his situation and make recommendations. *96 These specialists reported that with certain changes, petitioner could continue this operation and could expect to cut his losses to about $2,000 per year, after depreciation, and eventually make a profit if the breeding cattle could be sold at somewhere near current prices. But in 1955 and 1956, just 7 to 8 years after he had started to build his Angus herd, he sold the entire herd. He testified that he felt the characteristics of the Charolaise, a new breed in this country, which not only grew heavier in a shorter length of time but also produced beef with less outside fat which housewives were demanding, made them a better bet for a profitable operation and he had decided to switch to Charolaise anyway, but the flood in 1955 precipitated this change. Then, after paying high prices to start his Charolaise herd, he sold his entire stock in 1960 and 1961 before the Charolaise operation had a fair chance to prove itself. Steighter, who bought this herd and operated on petitioner's farm and who could not afford large losses, was apparently making a go of the Charolaise operation at the time of this trial. Petitioner's farming venture could hardly be considered one continuous venture *97 which had been operated at a loss for 24 years - it was more like three separate ventures. Some of the other factors we have taken into consideration in reaching our conclusion on this issue are the facts that petitioner immediately invested a considerable sum in setting up a commercial dairy operation in one of the leading dairy farming counties in the country in 1932 and thereafter continuously bought additional labor and cost savings' devices to make the operation more efficient, the farm manager he employed was willing to work full time at the farm for a small salary and a percentage of the profits although he had a business of his own, the farm produced a very sizable gross income each year, accurate and complete records were kept which permitted analysis of the various phases of the operation on a monthly or quarterly basis, the farm was run on a businesslike basis (most of which facts distinguish this case from Henry P. White, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939 (1956)), the herd was advertised in trade journals and by entering the top animals in cattle shows, petitioner *98 did not live on the farm until about 1951 and thereafter considerable care was taken to separate the expenses of operating the farm from the expenses of operating the residence (the latter being charged to petitioner personally), petitioner did not use the farm as a showplace or for entertainment purposes, and there was no evidence that petitioner took a great deal of pleasure or satisfaction out of being the owner of a country estate with a well-known breeding herd. We recognize that this case is unusual, although it is not unique. [2] There are not too many people who could absorb such losses, either from a business or from a hobby. It is true that petitioner was better able to absorb these losses because they could be set off against his sizable taxable income to produce a tax savings - but it is also true that after 1947 he was forced to invade his capital to a considerable extent to absorb his farm losses. Petitioner was a successful businessman and it seems more logical that he would do this because he hoped to recoup his capital over the long pull than that he was indulging in a quite expensive hobby with no intention of making it pay. Petitioner may have been both tenacious *99 and an "incorrigible optimist" but we believe this record supports his contention that he operated the farm in 1956 and 1957 as a business with the intent and expectation of eventually making a profit from the operation. The second issue involves the deductibility of a part of petitioner's New York office expenses claimed on the returns for 1956 and 1957. Respondent determined that one-half of petitioner's total office expenses during each year were allocable to petitioner personally and not to any business, and disallowed *100 expenses of $5,582.77 for 1956 and $6,470.26 for 1957. Respondent's argument is that half of the office expenses were attributable to the farm and, the farm not being a business, the expenses are not deductible. Our conclusion on the first issue disposes of this argument. Furthermore, we have found as a fact from the evidence presented that all of the accounting and clerical expenses claimed by petitioners on their returns for the years 1956 and 1957 were incurred in petitioner's business or in the production of income or the maintenance and conservation of income-producing property, and are therefore deductible. A third issue, involving the disallowance of deductions claimed for sales taxes in the amount of $400 for 1956 and $500 for 1957, was raised by the pleadings. However, petitioners introduced no evidence with respect to this issue and do not argue it on brief, so we assume they have abandoned it. In any event, respondent's determination is presumed to be correct. We hold for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. No question has been raised that the expenses of operating the farm were actually paid or that they were ordinary and necessary expenses.↩
2. See John S. Ellsworth (1962), George M. Zeagler (1958), and J. G. Stoller (1953), all Memorandum Opinions of this Court, as well as some of the cases cited in the body of this Opinion. Congress has also recognized that business enterprises of individuals may be operated at substantial losses for a number of years and has limited the deductible loss to $50,000 per annum if losses in excess of that amount have been sustained for 5 consecutive years. Sec. 270, I.R.C. 1954↩. Respondent conceded at the trial that this limitation was not applicable to petitioner because losses in excess of $50,000 had not been sustained for 5 consecutive years.