**William DuPONT, Jr. and Margaret Osborne DuPont, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 2538.

United States District Court
D. Delaware.

June 15, 1964.

682

William S. Potter, and Converse Murdoch, of Berl, Potter & Anderson, Wilmington, Del., and Kenneth Gemmill, of Dechert, Price & Rhoads, Philadelphia, Pa., of counsel, for plaintiffs.

Alexander Greenfeld, U. S. Dist. Atty., William J. Wier, Jr., Asst. U. S. Dist. Atty., Wilmington, Del., and Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, David A. Wilson, Jr., and Marvin J. Garbis, Department of Justice, Washington, D. C., for defendant.

STEEL, District Judge.

Plaintiffs, husband (hereinafter "taxpayer") and wife, filed a joint federal income tax return for 1960 and claimed as a deduction a $36,966.03 operating loss incurred in 1960 by Foxcatcher Livestock Company, a corporation, all of the stock of which was owned by taxpayer in 1960. Foxcatcher was a "small business corporation" (hereinafter "Subchapter S corporation"), as defined in 26 U.S.C. § 1371(a).

Sub-chapter S was added to the Code by § 64(a) of the Technical Amendments Act of 1958, P.L. 85–866, September 2, 1958, 72 Stat. 1650 et seq., and its provisions were effective for taxable years beginning after December 31, 1957. Its purpose was to permit "small business corporations," as defined by the statute, to elect not to pay a corporate tax, but instead to permit the corporate profits or losses to be reported by the stockholders in their individual returns. Sen.Rep. 1983, 85th Cong.2d Sess., U.S.Code Cong. & Admin.News 1958, p. 4791; 1958–3 Cum. Bull. 922, 1008.

In 1960, Foxcatcher, with the consent of plaintiffs, elected in accordance with Sub-chapter S, not to be taxed as a corporation. Consequently, any "net operating loss" which Foxcatcher sustained in 1960 was allowable as a deduction from the gross income of plaintiffs. 26 U.S.C. § 1374(a).

The loss which plaintiffs attributed to Foxcatcher was disallowed as a deduction and the present suit for refund followed. The burden of proof is on the plaintiffs to sustain their right to a refund. Opinion and order dated November 29, 1963.

The Government asserts that plaintiffs are entitled to claim Foxcatcher's loss as a tax deduction only if Foxcatcher's operation constituted a trade or business or was entered into for profit, and that such was not the case. In addition, the Government contends that even if Foxcatcher's operation amounted to a trade or business or was entered into for profit, two specific deductions were improperly taken and should be disallowed: (1) $3,125.00 pertaining to the bull inventory, and (2) $802.93, consisting of $654.93 spent for food and $148.00 of travel expenses incurred in obtaining the food.[1]

---

1. The Government also asserted in an amended answer filed August 23, 1963 that the salary of $8,160.00 paid to two professional fox hunters was improperly taken as a deduction from taxpayer's personal income on his 1960 tax return. The Government asserts that if a refund is found to be due to plaintiffs because of the resolution in their favor of other issues, the amount of the refund must be reduced to reflect the disallowance of the $8,160 salary item. Plaintiffs agree without conceding the impropriety of the deduction.

Plaintiffs take issue with the Government on all points.

### 1. General Applicability of Sub-chapter S.

The case presents a legal question of first instance, viz. whether Sub-chapter S authorizes stockholders of a corporation to utilize the "net operating loss" of the corporation in computing their individual federal income taxes if the corporation is not operated for profit but is maintained as a hobby, or for recreation or other personal gratification of its stockholders.

██ The Title of Sub-chapter S discloses that it relates to the status of "small business corporations," which subject themselves to its terms. The plain implication is that Sub-chapter S was intended to be limited to "business" corporations. Generally understood, a "business" corporation is one which is operated for purposes of making a profit. A more detailed analysis of the Code substantiates the conclusion that Sub-chapter S was intended to apply to corporations whose aim is to make money.

Section 1374(a) provides that the "net operating loss" of an electing small business corporation shall be allowed as a deduction from the gross income of the shareholders of the corporation "in the manner and to the extent set forth in this section." Subsection (b) states that each person who is a shareholder of an electing small business corporation shall be allowed as a deduction from gross income an amount equal to his portion of the corporation's "net operating loss (as determined under subsection (c))." Subsection (c) states that for purposes of section 1374 a shareholder's portion of the "net operating loss" of an electing small business corporation is his pro rata share of the corporation's "net operating loss" *computed as provided in section 172(c)*, subject to certain exceptions not presently important.

Thus, to compute the "net operating loss" of a small business corporation which its shareholders may deduct, resort to section 172(c) is necessary. Section 172(c) defines "net operating loss" as "the excess of the deductions allowed by this chapter", i. e. Chapter 1, "over the gross income."

The deductions allowed by Chapter 1 are specified in §§ 162 to 175, inclusive. These deductions, except to the limited extent that the sections otherwise indicate, are applicable both to individuals and to corporations. The deductions applicable to corporations are: Trade or business expenses (§ 162), interest (§ 163), taxes (§ 164), losses (§ 165), bad debts (§ 166), depreciation (§ 167), amortization of emergency facilities (§ 168), amortization of grain-storage facilities (§ 169), charitable, etc., contributions and gifts (§ 170), amortizable bond premium (§ 171), net operating loss deduction (§ 172), circulation expenditures (§ 173), research and experimental expenditures (§ 174), and soil and water conservation expenditures (§ 175).

The 1960 income tax return of Foxcatcher discloses that its taxable loss of $36,966.03 was computed by deducting $182,749.83 from its gross income of $145,783.80, and that its deductions consisted of the following items:

| | |
|---|---|
| Salaries and wages | $ 69,627.46 |
| Repairs | 28,225.32 |
| Rents | 18,252.80 |
| Taxes | 5,547.23 |
| Depreciation | 17,879.19 |
| Other deductions | 43,217.83 |
| | $ 182,749.83 |

The deductions which Foxcatcher took for salaries, wages and rent are expressly authorized by § 162(a) if they were paid or incurred in "carrying on any trade or business".[2] While none of the sections (161–175) in so many words

---

2. Section 162 is entitled "Trade or business expenses" and Sub-paragraph (a) reads: "(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—(1) a reasonable allowance for salaries or oth-

authorize the deduction of "repairs" and the "other expenses" claimed by Foxcatcher, the deductions are clearly justified under § 162(a), if they constituted ordinary and necessary expenses "paid or incurred * * * in carrying on any trade or business". Similarly, the depreciation taken by Foxcatcher is authorized by § 167 only if it pertains to property used "in the trade or business" or "held for the production of income".[3]

The requirement of §§ 162(a) and 167 that a corporation be engaged in trade or business in order to deduct salaries, wages, rents, repairs, and depreciation (unless the property depreciated be held for the production of income), clearly suggests that Sub-chapter S was intended to apply only to corporations engaged in a trade or business. But even if this broad conclusion is not warranted, the deductions claimed by Foxcatcher for wages, salaries, rents and repairs would have to be disallowed unless it were engaged in a trade or business, for that is the condition imposed by the sections under which the deductions are taken. Such disallowance would, of course, eliminate the loss claimed by plaintiffs and result in a substantial taxable gain to Foxcatcher which, under Sub-chapter S, would have to be reflected in the taxable income of the plaintiffs.

■ Plaintiffs point out that while subject to certain immaterial exceptions, § 165(c) limits losses allowable under § 165(a), in the case of individuals, to those losses incurred in a trade or business or in a transaction entered into for profit though not connected with a trade or business, § 165 prescribes no such limitation in the case of losses sustained by corporations. This is true. But the loss contemplated by § 165 is not an operating loss such as plaintiffs claim. It is a loss of property or some type of asset. Law of Federal Income Taxation, Mertens, § 28.12. The loss which § 165 (c) refers to does not include expenses of

a corporation. Law of Federal Income Taxation, Mertens, § 28.37.

Reg. § 1–165–6 states that, subject to immaterial exceptions, any loss incurred in the operation of a farm shall be allowed as a deduction if the farm is operated as a trade or business, but that a loss incurred in the operation of a farm for recreation or pleasure shall not be allowed. Reg. § 1.162–12 pertaining to "Expenses of farmers" reads:

"* * * If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products must be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions."

■ Unless the regulations are to be overturned—and there does not appear to be any reason why they should be—they provide a direct answer to plaintiffs' argument that Foxcatcher was entitled to deduct its losses under § 165(c) regardless of whether or not they were incurred in a trade or business.

Having concluded that Sub-chapter S is applicable only to corporations which carry on a trade or business, it is necessary to consider whether Foxcatcher falls within that category.

■ A dominant factor in determining whether a taxpayer is engaged in a venture for profit or merely for pleasure is the intention of the taxpayer. Tatt v. Commissioner of Internal Revenue, 166 F.2d 697, 698 (5th Cir. 1948). It is not essential that the taxpayer be engaged solely in the one activity which he claims to be his business. "He may have interests in several enterprises among which he divides his time." Commissioner of Internal Revenue v. Field, 67 F.2d 876, 877 (2nd Cir. 1933).

---

er compensation for personal services actually rendered; * * * (3) rentals * * *."

3. The tax deduction was permitted by § 164 regardless of whether Foxcatcher was engaged in business.

■ It has been said that to carry on a business within the contemplation of the Federal Income Tax Law, requires that the activity or enterprise be entered into with "the dominant hope and intent of realizing a profit * * *", Hirsch v. Commissioner of Internal Revenue, 315 F.2d 731, 736 (9th Cir. 1963); Coffey v. Commissioner of Internal Revenue, 141 F.2d 204, 205 (5th Cir. 1944), and that if a taxpayer's intent to make a profit is entirely secondary to the gratification of his desire to remain in an activity with which he has been allied all his life, the activity is not a business venture but a recreational or hobby interest, Wise v. Commissioner of Internal Revenue, T.C.Memo. 1957–83, P-H Mem. T.C. 57–306, 307–308, aff'd per curiam, 260 F.2d 354 (6th Cir. 1958). Other courts have more persuasively stated that if a taxpayer engages in an activity for the purpose of making a profit *and not merely for pleasure,* he is engaged in a business. Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191, 194 (1933); Brooks v. Commissioner of Internal Revenue, 274 F.2d 96, 99 (9th Cir. 1959); Rowe B. Metcalf, Tax Court Memo. 1963–277, 22 T.C.M. 1402 (1963); Thacher v. Lowe, 288 Fed. 994, 995 (S.D. N.Y.1922). In Deering v. Blair, 23 F.2d 975, 976 (D.C.Cir. 1928), the Court said that it is only necessary that "profit be at least one of the purposes for which the employment is pursued * * *." If, however, a taxpayer is utterly indifferent to whether there is a gain or loss from a given activity, or if it is shown that the operation is an incident to the social or domestic aspects of the taxpayer's daily life, then an activity or operation will not be deemed to be a business. Commissioner of Internal Revenue v. Widener, 33 F.2d 833 (3rd Cir. 1929).

The motives which prompt a person to work at a given calling are usually mixed. Perhaps more often than not the primary motive is to make money. But in many instances this is not the sole reason. Pride of accomplishment, loyalty to one's family and a desire to carry on a successful business which it has built up, the urge to develop a business for one's children, the challenge of endeavoring to succeed where others have failed, the physical or mental satisfaction derived from the work and the solution of its problems, and the achievement of economic status and prestige are but some of the incentives which, independently or in conjunction with a desire to make money, induce one to pursue a particular activity. A rule which would require that the profit motive dominate all other considerations before one can carry on a trade or business within the meaning of the federal revenue act is not a realistic test. It is enough, as many of the cases have recognized, that a taxpayer have a bona fide interest and purpose in making the venture a profitable one. If he has, the fact that he also obtains non-monetary rewards is irrelevant.

■■ Whether or not a taxpayer has the requisite intention or motive to make an enterprise profitable is a question of fact to be determined not only from the direct testimony of the taxpayer as to his intention, but from a consideration of all of the evidence. American Properties, Inc. v. Commissioner of Internal Revenue, 28 T.C. 1100, 1111, aff'd, 262 F.2d 150 (9th Cir. 1958). Despite the opinion of the Chief Legal Officer of the Bureau of Internal Revenue expressed in 1939 to the contrary, G.C.M. 21103, 1939–1 Cum.Bull. (Part I), 164, 167, it has been held that the expectation of the taxpayer to make a profit need not even be a reasonable one. Hirsch v. Commissioner, supra, 316 F.2d p. 736. Which of these views represents an accurate expression of the law need not be determined. Here the taxpayer testified that in 1960 his motive in operating Foxcatcher was "for a profit so I wouldn't have to foot a loss." Separate findings of fact are being filed which on balance not only support the testimony of the taxpayer, but also establish the reasonableness of the expectation of the taxpayer in 1960 to operate on a profitable basis someday in the not too distant future.

Certain of the Government's arguments require comment:

■ 1. Foxcatcher has sustained annual heavy losses from 1945 when it was organized until and including 1960 and this indicates, the Government asserts, it was not operated to make a profit. A long series of losses, while undoubtedly a material factor in determining whether an enterprise is operated for profit, does not in and of itself make it a hobby or indicate that profit making was not an objective. The losses must be considered with all other factors indicative of a taxpayer's intention, including his efforts to make the operation profitable. In Metcalf v. Commissioner, P-H Mem. T.C. 1587, 1595, decided October 7, 1963, the Tax Court held that a farm was operated for profit even though losses had been sustained for twenty-four successive years. "It is the expectation of gain, and not gain itself which is one of the factors that enter into the determination" of whether farming is carried on as a business or as recreation. Samuel Riker, Jr., 6 B.T.A. 890, 893 (1927). In Whitney v. Commissioner of Internal Revenue, 73 F.2d 589, 592 (3rd Cir. 1934), the facts that a racing stable had not shown a profit for nine years and plaintiff had not claimed a deduction for losses prior to the year in question, were held not to deprive the racing stable of the status of a business.

■ In the present case the efforts of the taxpayer were unquestionably directed toward making the operation profitable. The delay in achieving his goal under the circumstances revealed by the record is not especially significant. When the taxpayer in 1942 (prior to the organization of Foxcatcher) decided to develop a herd of Santa Gertrudis cattle, he was told that it had taken the King Ranch twenty-five years to do it. Whether or not this was true, it was the information which the taxpayer had when he acted. The Santa Gertrudis project was at best a long range one, and the taxpayer realized this when he decided to go into the business. Furthermore, the cattle developed brucellosis, a virus disease, which made it inexpedient to mix new healthy animals with those which were diseased, and in 1953 the taxpayer "cleaned house" by causing Foxcatcher to dispose of all cows which showed a titre and by selling all of its Brahma bulls and Shorthorn cows. Obviously, this occasioned a delay beyond even the normally long period of time required to develop a Santa Gertrudis strain. Compare Rowe B. Metcalf, supra, (at 22 T.C.M. 1410) where it was said:

> "Raising a breeding herd is a risky business and takes considerable capital and time to develop. The evidence indicates that it normally takes about 15 years to build up a breeding herd, and that to do it properly that the better animals that would sell for more should not be sold until the herd is developed".

2. It is said that Foxcatcher failed to keep records which accurately reflected its profit and loss and that this is indicative of taxpayer's indifference to whether the operation was profitable, especially as the taxpayer was a wealthy man of broad business experience.[4]

Particular stress is laid on the following:

(a) Six bulls valued at $41,500 owned by taxpayer at the end of 1958, were erroneously included in Foxcatcher's inventory at the end of 1959 and the end of 1960.[5] This error had no effect upon the income of Foxcatcher for 1960, but resulted in an overstatement of the loss suffered by Foxcatcher in 1961 and a corresponding understatement of the loss suffered in 1959. There is nothing to indicate that this mistake was deliberate. It does not either alone or in combina-

---

4. The Government concedes that Foxcatcher's records were "more or less" adequate from an agricultural standpoint; i. e. breeding records were maintained, the number of cattle at Fair Hill were counted on a weekly basis, and annual inventory counts were made.

5. By the end of 1961 they had been properly removed from its inventory.

tion with other facts relied upon by the Government negate an intention by the taxpayer to make a profit from his cattle operation.

(b) Each year 75 or 80 weaned steers were sent from Fair Hill to Bellevue, the farm north of Wilmington where plaintiffs lived, where the steers stayed for the five winter months. Furthermore, each year two groups consisting of 15 to 20 weaned heifers were sent from Fair Hill to Silver Tip, recreational land owned by taxpayer near Easton, Maryland, where the heifers were maintained for a year. While away from Fair Hill, both the steers and the heifers were fed what was grown at Bellevue and Silver Tip at taxpayer's individual expense.

The fact that taxpayer never prepared a *pro forma* statement to show what the profits to Foxcatcher would have been if the steers and heifers had been retained at Foxcatcher and fed at its expense, is of little moment. The arrangement between Foxcatcher and taxpayer was mutually satisfactory. The cattle were needed at Bellevue and Silver Tip to make manure. The fact that Foxcatcher furnished its cattle relieved the taxpayer from buying steers to make the manure. In return, Foxcatcher was freed from feeding the cattle while they were at Bellevue and Silver Tip, except for the supplements which Foxcatcher purchased. From the standpoint of both Foxcatcher and the taxpayer, the arrangement was good business. The fact that no records show just how beneficial from a dollar and cents standpoint the exchange was, is not significant.

(c) The profit disclosed by Foxcatcher's income tax return for 1962 is not realistic. During that year Mr. Shelton, who performed managerial services at Foxcatcher comparable to those which he had performed in prior years, was taken off Foxcatcher's payroll and his salary of $6500 was paid by the taxpayer

individually. Similarly, the salary of Miss Elburn, who had taken care of the farmhouse at Foxcatcher and had been paid by it prior to 1960, was removed from the corporate payroll and paid through taxpayer's fox hunting account. Mrs. White, who kept the books and records of Foxcatcher, was paid nothing by it during the years 1957–1962. All, or at least part, of the expenses of each of these individuals (depending upon whether all or part of their time was devoted to the affairs of Foxcatcher) should have been included in the expenses of Foxcatcher if a true statement of its profits or losses were to be obtained.

Presumably, the 1962 tax return was filed while the allowability of Foxcatcher's 1960 loss was the subject of this litigation.[6] The Government would, apparently, have the Court infer that the reported profit for 1962 was simply a ruse to justify the taxpayer's professed expectation that Foxcatcher could be operated profitably. Why the salaries in question were not deducted in computing Foxcatcher's profit and loss for 1962 has not been explained. But whatever the reason may have been, the record contains so much other evidence which compellingly supports plaintiffs' claim that the cattle operation was being conducted for the purpose of making a profit, that the overstatement of profit for 1962 cannot fairly be accorded the effect either alone or with the other evidence, of negating the profit making motive.

3. As further pointing to an absence of profit motive, the Government asserts that Foxcatcher never employed a cost accountant or an expert in cattle operations, that no analysis was made of its costs, and that it never adopted a bonus or incentive plan for the benefit of its manager. While perhaps the presence of any one or more of these circumstances would tend to buttress the claim that the taxpayer was attempting to make the

6. The record fails to reveal when the 1962 return was actually filed. It would normally have been filed on or before April 15, 1963. Plaintiffs paid the al-

leged 1960 deficiency plus interest on July 10, 1962. The present action was begun on January 2, 1963.

operation a profitable one, the converse does not necessarily follow. The taxpayer, not without reason, testified that he was the cattle expert. The record abundantly attests his active interest and long experience in farm and cattle operations and the frequency with which he consulted with others versed in the field. Nowhere is it suggested in the record that a bonus or incentive plan is the rule where profit is an objective in a cattle operation. It may be conceded that Foxcatcher's records were inaccurate to the extent indicated in the Findings and this opinion and not all that they might have been. But this has little significance when viewed against the many and varied efforts which Foxcatcher made to cut costs by experimenting with different kinds and proportions of feed, its attempts to reduce its labor force, its alteration of the character of its silos, the operating budgets which it prepared, the trips which taxpayer made to Texas to observe the cattle operations of the King Ranch, his consultation with experts, and other matters referred to in the Findings, all of which pointedly indicate the strenuous efforts which Foxcatcher was making to get the operation on a profitable basis.

4. The emphasis which the Government places on the fox hunting, the Fair, and the races which took place on the property which Foxcatcher leased, is overwrought. Had these activities been the primary interest of the taxpayer, he could have pursued them without Foxcatcher raising cattle, and thus could have avoided the large annual losses which Foxcatcher sustained from its cattle operation. The expenses of fox hunting, the Fair and the races were not borne by Foxcatcher, and they did not interfere with or have any adverse effect upon its operations.

5. Taxpayer testified he was prompted to acquire the land leased by Foxcatcher as an inflation hedge, based upon his conviction that over the years the land would necessarily appreciate substantially in value. Because of his confidence in the long run profit potential of the land itself, taxpayer stated that he was willing to see Foxcatcher take losses for twenty years, and that if he found that Foxcatcher was losing more money than the land was gaining in value, he would most probably have sold the farm. One of the purposes in maintaining the cattle operation at Fair Hill, according to taxpayer, was to keep the area from growing up into woods and bushes and to prevent erosion and washes by cultivating the land and grazing cattle on it. In this way, taxpayer felt, the land would look better when it was sold than it would if it were "grown up like a back woods."

The Government points out that the land was owned by Fair Hill, Inc. and by Spring Lawn, Inc. Consequently, it argues, even if those corporations were conducting a trade or business which made the expense of maintaining the land ordinary and necessary, Foxcatcher, not being the owner of the land or a potential beneficiary of its sale, was not entitled to deduct the excess of its expenditures over its gross income.

The conclusion does not follow from the premise. It may be conceded that a purpose—and perhaps the primary purpose—of the cattle operation was to maintain the land for profitable resale by Fair Hill, Inc. and Spring Lawn, Inc. Neither in 1960 nor at the time of the trial did the taxpayer have any immediate plans to sell the land. He testified that the disposition of the land would start in about fifteen years, or fifteen to twenty years, if the country continues to "go" (grow) as it has. The land will not become less valuable if Foxcatcher makes a profit in its cattle operation. While the land is being held, the taxpayer will be better off dollar-wise if the cattle operation is profitable than if the contrary were true. The cattle business is not being conducted on a plush basis as part of a fancy country estate, but has every appearance of being a large-scale, practical operation which is being carried on with an eye to effecting every possible economy. There is nothing inconsistent between the desire on the part of the taxpayer to conduct a cattle opera-

tion to maintain the land for ultimate resale, and his desire in the interim to make profits from the cattle operation.

### 2. *The Bull Inventory Loss.*

A part of Foxcatcher's loss of $36,-966.03 in 1960 which plaintiffs deducted on their tax return resulted from the death in 1960 of two Maltzberger bulls, MZ–3 and MZ–9, which plaintiffs claim Foxcatcher owned on January 1, 1960. The loss attributable to the death of the bulls was $3,125.00. The Government asserts that plaintiffs have failed to establish that Foxcatcher owned the bulls on January 1, 1960.

The record of the livestock inventory of Foxcatcher as of December 31, 1959, indicates that it owned eight Maltzberger bulls, including MZ–3 with an assigned cost of $1,000 and MZ–9 with an assigned cost of $2,125.00.[7] But other evidence relating to Foxcatcher's ownership of MZ–3 and MZ–9 on January 1, 1960 is far from convincing and involves inconsistencies that have not been satisfactorily reconciled.

The taxpayer's testimony is that all of the Maltzberger bulls which taxpayer or Foxcatcher ever owned—12 in number—were initially purchased by taxpayer for his individual account in 1953 and 1954. He stated that in 1953 he acquired seven Maltzberger bulls, six of which cost a total of $6,000 and one of which cost $2,-500.[8] Since these were the first Maltzberger bulls purchased, and according to taxpayer the bulls were numbered consecutively in the order of their purchase, it follows that they should have been identified as MZ–1–7, with a cost of $1,000 assigned to each of the six which taxpayer said were bought for $6,000.

The sales records (DX 16), however, are at variance with this. They disclose that in the summer of 1953 taxpayer purchased five bulls (not seven as taxpayer testified), the first four being acquired on July 21, 1953, and the fifth on August 1, 1953. These bulls were identified on the sales slips as MZ–8, 9, 10, 11 and 6, and not as MZ 1–7, as taxpayer indicated.

In 1954, according to the taxpayer, he bought five more Maltzberger bulls, four for $10,500 and one for $2,000. If, as taxpayer testified, the MZ bulls had been numbered in the order of their purchase and seven bulls had been bought in 1953, then the bulls bought in January 1954 should have carried the designation MZ–8 to 12.

Here, again, the documentary evidence is at variance with the testimony. A memorandum dated January 4, 1954 (included with DX 12) indicates that six bulls were purchased in 1954 (not five as taxpayer stated), two from William Maltzberger for $2,000, and four from J. T. Maltzberger, Jr. for $10,500. Furthermore, taxpayer's testimony and the memorandum of January 4, 1954, are at variance with the sales slips. The latter disclose that on January 5, 1954, taxpayer acquired seven bulls—two identified as MZ–3 and MZ–4, from Bill Maltzberger, and five identified as MZ–1, 2, 5, 7, and 12 from J. T. Maltzberger, Jr.[9] The memorandum of January 4, 1954 and taxpayer's check dated January 4, 1954, drawn on his Special Account to J. T. Maltzberger, Jr., for $10,500 suggest that taxpayer actually bought four bulls for $10,500 as he testified.

It is the theory of plaintiffs that the Maltzberger bulls, although initially bought by taxpayer personally, were later transferred to Foxcatcher in transactions whereunder Shapdale paid taxpayer the amount which taxpayer had

---

7. A "revised" livestock inventory apparently made in September of 1963, likewise reveals that as of December 31, 1959, Foxcatcher owned eight MZ bulls, with MZ–3 and MZ–9 stated to have cost $2,625 and $1,000, respectively.

8. A check, # 10,872, dated July 15, 1953, drawn upon taxpayer's Special Account

to The Maltzberger Ranch for $8,500, ostensibly appears to be in payment of these seven bulls.

9. While it may be presumed that the two bulls bought from William Maltzberger for $2,000 were paid for, the record contains no evidence of such payment.

paid for the bulls, and Foxcatcher became indebted to Shapdale in like amount. The foundation for this claim is testimony based primarily upon copies of two invoices from taxpayer to Shapdale, PX 11, 13, and two Foxcatcher journal entries, PX 12, 14.

PX 13 is a document captioned "Copy Invoice to Shapdale, Inc. from Wm. du Pont, Jr., and charged to Foxcatcher

"12–23–53—Santa Gertrudis bulls,
     # 1–2–3–4–5–6 of
     Maltzberger blood lines      $6,000.00"

Livestock Co.", and is dated December 24, 1953. It lists a number of dates in 1953 opposite each of which is a specified number of bulls, cows and heifers with identifying numbers and their cost. The total cost of all the cattle shown on the invoice is $37,500. At the foot of the invoice is the notation, "For delivery to Fair Hill, Maryland".[10] One item on this invoice reads:

---

This statement on the invoice cannot be reconciled with the sales slips, for they indicate that of the bulls designated as MZ 1 to 6 on PX 13 under the 12–23–53 entry, only MZ–6 had been acquired by the taxpayer in 1953. According to the sales slips, the other bulls referred to in the journal entry of December 23, 1953, viz. MZ–1, 2, 3, 4, and 5, were acquired by taxpayer in January 1954. Furthermore, it is impossible to reconcile the cost of $6,000 assigned to MZ 1 to 6 on PX 13 with the check of the taxpayer of July 15, 1953 for $8,500 to the Maltzberger Ranch, which apparently was in payment either of the four bulls purchased by the taxpayer in July of 1953, or the five bulls purchased in July and August, 1953, indicated by the sales slips.

The Foxcatcher journal entry as of December 31, 1953 (PX 14, p–4) relates to the transaction shown on the invoice, PX 13, covering the sale of a large number of bulls, cows and heifers, for a total of $37,500. As stated, the sale included,

according to the invoice, MZ–1, 2, 3, 4, 5, and 6. However, the Foxcatcher journal entry makes it clear that *all* of the cattle on the invoice were not transferred to Foxcatcher. Foxcatcher, according to the journal entry, acquired as inventory only the cattle which cost $14,000—not all of the cattle having a cost of $37,500. Which particular bulls were included within the $14,000 cattle item cannot be ascertained from the journal entry. This is the case regardless of whether the invoice, PX 13, is accepted at face value as covering MZ 1–5 as well as MZ–6, or its accuracy is rejected, insofar as it purports to relate to MZ–1–5, because the sales slips (and to some extent the check of July 15, 1953) indicate that taxpayer did not acquire MZ 1–5 in 1953.

PX 11 is an undated document which appears to be a copy of an invoice from the taxpayer to Shapdale, Inc. for $44,115.00, and presumably relates to bulls and heifers previously purchased by the taxpayer on the dates designated. Among the items is the following:

| "Date | Check | Amount |
|---|---|---|
| 1/4/54 | 11034—J. T. Maltzberger, Jr.—4 bulls | $10,500" |

---

10. In itself, this notation means little, for at times over the years in question cattle owned both by Foxcatcher and taxpayer individually were kept at Fair Hill, just as cattle owned by Foxcatcher were at times kept with taxpayer's individually owned cattle at taxpayer's farms at Silver Tip, Maryland, and Bellevue, Delaware.

PX 12 is the Foxcatcher journal entries reflecting the acquisition by Foxcatcher on January 1, 1955 of the bulls covered by the invoice, PX 11, and includes specifically "4 bulls—$10,500." Presumably taxpayer's check of January 4, 1954 to J. T. Maltzberger, Jr. for $10,500 was given in payment of these bulls. The memorandum of January 4, 1954, as well as the invoice, PX 11, confirm this fact. However, the sales slips of January 5, 1954 indicate that only bulls MZ–1, MZ–2, MZ–3, MZ–4, MZ–5, MZ–7 and MZ–12 were acquired in January 1954. These sales slips also indicate that bulls MZ–3 and MZ–4 were acquired from *Bill Maltzberger*. The memorandum of January 4, 1954 also supports the sale by Bill Maltzberger to taxpayer of two bulls for $2,000, presumably MZ–3 and 4. If the sales slips, memorandum and check accurately reflect what happened, there is no documentary evidence to support the claim of plaintiff that MZ–9 was one of the four bulls acquired by Foxcatcher for $10,500.

▮ From the foregoing discussion, it is apparent that the record as to Foxcatcher's ownership of MZ–3 and MZ–9 on January 1, 1960, is at best garbled. Plaintiffs have failed to establish by a preponderance of the evidence that on January 1, 1960 Foxcatcher was the owner of MZ–3 and MZ–9. The $3,125 loss which plaintiffs assert Foxcatcher sustained because of the death of these two bulls in 1960 must, therefore, be disallowed.

### 3. *The Food Expense Deduction.*

▮ The Government points out that the food expense of Foxcatcher in 1960, and the travel expense incident to the procurement of the food, amounted in the aggregate to $802.93 and that this is reflected in Foxcatcher's loss of $36,966.03 which plaintiffs took as a deduction. The Government argues that the food expense should be disallowed because plaintiffs failed to sustain the burden of proving that any part of the food expense was an ordinary and necessary business expense of Foxcatcher. The Government asserts that the money was spent to provide food for Shelton, the farm manager, taxpayer after fox hunts, taxpayer's guests, the housekeeper Miss Elburn and her personal friends, the cattle classifiers and veterinarian, and those attending political meetings. The sweep of the Government's argument is too broad. On July 25, 1963, a stipulation was entered into and approved by the Court, which required the Government to submit to the plaintiffs and to the Court, a written statement of

"(b) every deduction from income of the Foxcatcher Livestock Company which the defendant claims should be disallowed for the calendar year 1960 and the reason for such disallowance."

Pursuant to this stipulation and order, the Government filed a statement of "Specific Deductions Which Should Be Disallowed", which challenged the food and travel expense of $802.93. The Government asserted that these expenses should be disallowed solely because they were not ordinary and necessary expenses of the corporation since the food was prepared for and served to taxpayer and/or his guests. Nothing was said about the food having been served to Mr. Shelton, Miss Elburn and her friends, the cattle classifier or veterinarian, those attending political meetings, or the impropriety of the deductions because those persons were provided with food. It is now too late to question them.

Miss Elburn was a full time housekeeper who lived on the premises. The expense of $802.93 covered not only her food but also that provided for all of the other persons mentioned by the Government. It is obvious that the occasions were rare when food was served to taxpayer or his guests on non-business visits and the amount spent for food on such occasions were minimal.

Some of the cases cited by the Government would require a disallowance of the entire $802.93 because of the failure of the plaintiffs to apportion that amount between business and non-business expenses. But the rule of Cohan v. Com-

missioner of Internal Revenue, 39 F.2d 540 (2nd Cir. 1930) seems the more reasonable, permitting as it does judicial allocation, with all doubts as to the amount thereof resolved against the taxpayer, even though the allocation is to some degree speculative.

In the instant case a disallowance of $150 of the total expense of $802.93 deducted would be liberal from the Government's standpoint. Accordingly, $150 of the food and travel expenses is disallowed as not being an ordinary and necessary expense incurred by Foxcatcher in connection with its business.

This opinion shall constitute Conclusions of Law. Separate Findings of Fact are being filed simultaneously herewith.