Norman C. Demler and June R. Demler v. Commissioner.
Demler v. Commissioner
Docket No. 5216-64.
United States Tax Court
T.C. Memo 1966-117; 1966 Tax Ct. Memo LEXIS 166; 25 T.C.M. (CCH) 620; T.C.M. (RIA) 66117; May 31, 1966
Charles K. Rice, for the petitioners. Stephen M. Miller, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in income taxes and additions to tax for petitioners' taxable years and in the amounts as follows: Year ended
Additions to
January 31
Income tax
tax
1960
$5,988.90
$ 404.90
1961
8,525.14
1,278.77
1962
5,999.79
0
Some issues appear to have been settled by agreement of the parties. The issues remaining for our decision are: (1) Was Norm Demler, Inc., engaged in a trade or business? (2) If Norm Demler, Inc., was *167 not engaged in a trade or business, does the fact that it is a Subchapter S electing corporation nevertheless permit its losses to be taken by petitioner as its sole shareholder? (3) What, if any, amount of depreciation on the 1960 Cadillac should be allowed? (4) Were the late filings of petitioners' Federal income tax returns for the fiscal years ended January 31, 1960 and 1961 due to reasonable cause? Findings of Fact Norman C. Demler and June R. Demler are husband and wife residing in Niagara Falls, New York. For the taxable years ended January 31, 1960, 1961, and 1962, they filed joint Federal income tax returns with the district director of internal revenue at Buffalo, New York. June R. Demler is a party to this proceeding solely because she signed the joint returns. Any reference herein to "petitioner" shall refer to Norman C. Demler. In 1928, shortly after leaving high school, petitioner moved to California from North Tonawanda, New York. He acquired an appliance store in Los Angeles, where he employed Harry Hooker (hereafter referred to as "Hooker") as a part-time servicerepairman. Hooker was a racing mechanic who owned and raced a racing car. Petitioner often assisted *168 Hooker in his racing activities. Later, Hooker left petitioner's employ. Petitioner acquired Hooker's racing car. Hooker had intensively trained petitioner in the handling of the racing car. Petitioner raced the car along the Pacific Coast at meets held two or three times a month, at which he would earn small amounts of money. During this period he became acquainted with prominent racing figures such as Lou Moore. In 1933 petitioner moved back to North Tonawanda, where he entered the businesses of manufacturing cider and vinegar and of renting searchlights. By 1945, petitioner had also entered the grain farming business. All three of these businesses were conducted by petitioner as an individual in the years before us. After leaving California, petitioner maintained his interest in automobile racing by attending racing meets, acting as a pit crew member for other racing car owners or as a spectator. He regularly attended the Indianapolis 500 race held annually in the spring. Every winter, petitioner visited the Offenhauser plant of the Meyer-Drake Company where Offenhauser engines were produced for racing cars. These visits enabled petitioner to keep abreast of developments in *169 the racing field. Petitioner intended to increase his participation in auto car racing at some future date. In 1954, after petitioner had given consideration to and worked on the design and specifications of a racing car of his own, he approached Louis Meyer of the Meyer-Drake Company regarding the construction of a racing engine to be built according to petitioner's specifications. Because of prior commitments, Meyer declined to build the engine. In 1957, petitioner sold a parcel of land located in the Town of Wheatfield for $465,000, realizing a profit of $434,000. In the same year, petitioner again discussed the possible construction of a racing engine with Louis Meyer, at which time Meyer decided to build two engines according to petitioner's specifications, one for petitioner and one for himself. The principal innovation of the design was that it was horizontal rather than vertical in position, thereby providing less frontal area and, correspondingly, less wind resistance. Petitioner used about twenty component suppliers in obtaining parts for his car, the construction of which took approximately eight months. The "Demler Special," as the car became known, has a low center *170 of gravity and is classified as a roadstertype car, designed for use on a paved track. The cost of the chassis and engine alone was $22,000. On May 26, 1959, petitioner formed Norm Demler, Inc., a New York corporation (hereafter sometimes referred to as "Corporation"). Petitioner received 200 shares of its capital stock (which represented all of its issued and outstanding shares) in exchange for the transfer to the Corporation of the Demler Special, a utility trailer, and a platform truck. The principal purpose of forming the Corporation was to limit the petitioner's liability against claims for damages arising out of the hazardous nature of auto racing. Petitioner has at all times been its sole shareholder. On June 25, 1959, the Corporation elected to be taxed under Subchapter S of the Internal Revenue Code of 1954 and since its incorporation has filed its Federal income tax returns on a fiscal year ending January 31 under Subchapter S. The Corporation has engaged in no activity other than auto racing. The Indianapolis 500 is the name given to an annual [1] race of motor cars held on Decoration Day (May 30) of each year at the Indianapolis Motor Speedway located on the northwest *171 fringe of Indianapolis in Speedway, Indiana. In terms of prize money involved, prestige in the auto racing field, and public interest, the Indianapolis 500 is, and at all relevant times was, the most important and most lucrative automobile race held in the world. The Indianapolis 500 is conducted by the Indianapolis Motor Speedway Corporation (hereinafter referred to as "Speedway Corporation"), a privately-owned corporation, and is under the supervision of the United States Auto Club, a nonprofit organization which is the sanctioning organization for automotive competitions. The United States Auto Club licenses the personnel, arranges the rules and regulations, schedules the events, arranges for purses paid, provides qualified officials, and generally supervises the conduct of the races. The United States Auto Club supervises four divisions of auto racing: (1) National Championship Division; (2) Sprint Car Division; (3) Midget Car Division; (4) Stock Car Division. The National Championship Division is comprised of the Indianapolis 500 and some 12 to 16 other events of lesser importance on the *172 National Circuit, all of which are referred to as National Championship races. To enter a National Championship race, a car must meet minimum specifications and requirements (relating to wheel base, engine size, and general construction) which are laid down by the United States Auto Club. Cars which meet these requirements are known as National Championship type cars. The Indianapolis 500 is a 500-mile race, 200 laps around the 2 1/2 mile Indianapolis Motor Speedway which was built in 1911 originally with bricks. In 1955-1956, the entire track was repaved with special asphalt. There is no limit to the number of National Championship type cars which may attempt to qualify for the Indianapolis 500, but the starting field is limited to the thirty-three cars with the fastest times, determined by qualifying trials. Between 70 and 80 cars seek to qualify each year. The prize money available to entrants in the Indianapolis 500 consists of (1) qualifying prize money; (2) Speedway Corporation prize money; (3) accessory prize money; and (4) lap prize money. Qualifying prize money was posted by the Speedway Corporation for the years 1958 through 1965 as follows: (a) For 1958 and 1959, *173 individual awards of $1,000, $750, $500, $250, and $125 for the five fastest qualifiers on each of the four qualifying days plus $1,000 for the fastest qualifying time on any of the four days. Total qualifying prizes posted in each of these years amounted to $11,500. (b) For 1960, 1961, and 1962, individual awards of $1,200, $800, $600, $400, $300, and $200 for the six fastest qualifiers on each of the four qualifying days plus $1,000 for the fastest qualifying time on any of the four days. Total qualifying prizes posted in each such year amounted to $15,000. (c) For 1963, 1964, and 1965, individual awards of $1,200, $800, $600, $400, $300, and $200 for the six fastest qualifiers on each of the four qualifying days plus $1,000, $900, $800, $700, $600, $500, $400, $300, $200, and $100 for the 10 fastest qualifying times regardless of the day on which the car qualified. Total qualifying prizes posted in each such year amounted to $19,500. The maximum qualifying prize money available each year to a single entrant was $2,000 in 1958 and 1959 and $2,200 in each of the years 1960 through 1965. Speedway Corporation prize money consists of guaranteed minimum prizes which, if conditions *174 warrant, [2] are supplemented with additional funds. Speedway Corporation guaranteed and supplemented prize money which was awarded to each of the thirty-three starters during the years 1952 through 1965. Accessory prize money consists of funds paid through the Speedway Corporation by various corporations whose products are used by certain finishers. Lap prize money consists of funds donated by the Citizens' Speedway Committee of the Indianapolis Chamber of Commerce. The total lap prize money paid is $30,000 per year. Of this amount, $150 is paid to the leader on each of the 200 laps. On occasion, a single entrant has won more than $29,000 of the $30,000 posted in lap prize money. The total prize money paid to the first five winners and to all entrants during the years 1952 through 1965, including guaranteed prize money, additional prize money, accessory prize money, and lap prize money, was as follows: 1st
2nd
3rd
4th
5th
Total paid to
Year
place
place
place
place
place
all entrants
1952
$ 61,743
$24,368
$14,768
$11,818
$ 9,718
$230,100
1953
89,496
27,296
16,421
12,946
10,621
246,300
1954
74,934
35,884
27,409
12,709
10,934
269,375
1955
76,138
30,088
16,988
12,888
10,763
270,400
1956
93,819
32,919
20,419
15,769
10,744
282,052
1957
103,844
38,494
21,794
19,369
11,094
300,252
1958
105,574
38,874
24,999
17,199
11,399
305,217
1959
106,850
39,800
32,375
15,475
11,975
338,100
1960
110,000
48,025
24,350
15,475
15,100
380,650
1961
117,975
53,400
26,500
16,025
13,725
414,600
1962
125,015
44,566
26,591
16,716
14,316
439,625
1963
148,513
56,238
32,613
21,288
18,588
513,530
1964
153,650
56,925
35,650
21,200
17,625
525,875
1965
166,621
64,661
42,551
26,641
21,981
647,699
*175 In addition to the foregoing, the owner of the car finishing first is in a position to realize an additional $25,000 to $40,000 from displays, exhibitions, and product endorsements. In 1958, petitioner, as an individual, entered the Demler Special in the Indianapolis 500 for the first time. Petitioner's car finished second. The winner's time was approximately 29 seconds faster than petitioner's time out of a total of almost three-and-three quarters hours elapsed time. In 1959 and each year thereafter through 1965 the Corporation entered the Demler Special in the Indianapolis 500. The finishing position of the Demler Special and prize money earned by petitioner in 1958 and by the Corporation in 1959 through 1965 were as follows: [3]
Finishing
Speedway
Qualifying
Acces-
position
prize
Lap
sory
Year
in race
Total
money
prizes
prizes
prizes
1958
2nd
$38,374
$25,849
$2,700
$9,825
1959
5th
12,725
9,675
$ 750
2,300
1960
3rd
24,650
16,800
300
7,550
1961
22nd
11,010
5,110
600
5,250
50
1962
Did not qualify -
1963
18th
8,750
7,150
1,400
200
1964
4th
21,500
15,650
300
5,500
1965
Did not qualify
*176 Each car entered in the Indianapolis 500 is required to have a pit crew which is limited to eight persons, including the driver and chief mechanic, whose job it is to prepare the car for the race and who is responsible for the mechanical condition of the car during the qualifying trials and during the race. The chief mechanic must be licensed by the United States Auto Club and must be a knowledgeable and experienced motor mechanic to obtain such a license. He is held responsible by the United States Auto Club for mechanical failures in the race traceable to his ability as a mechanic. The other six members of the pit crew consist of tire changers, signalman-scorekeeper, and fueler. The driver and the chief mechanic are the only members of the pit crew who are paid but it is customary for a car owner to give a member of the pit crew a gift or bonus if he wins the race or earns substantial prize money. The financial arrangements with the driver and chief mechanic for the Demler Special were as follows: Driver
Chief mechanic
Guaranteed
Percentage of
Percentage of
Year
payment
prize money
prize money
1958
$ 600
40%
10%
1959
2,800
40%
10%
1960
4,000
40%
10%
1961
5,000
50% if first
*
40% otherwise
1962
5,000
50% if first
*
40% otherwise
1963
4,000
40%
10%
1964
2,000
40%
10%
1965
600
40%
*
*177 When not at Indianapolis, petitioner kept the Demler Special at his home at 2525 River Road in the Town of Wheatfield, New York, where he could, and did, work on the car in his spare time. Petitioner spent many hours of work each year in preparing the Demler Special for entry in the Indianapolis 500. Prior to taking the car to Indianapolis each year, he put in an average of 750 to 800 hours of work on the car, which included overhaul, magnafluxing, building, replacement of parts, etc. During the month of May, while the car was at Indianapolis, petitioner worked seven full days a week. This work involved continual testing of the car - checking carburation, changing weight adjustments, etc. An all-purpose racing car is one designed for use on any track, whether dirt or paved. A roadster-type racing car, such as the Demler Special, is not suitable for use on a dirt track *178 because such use involves danger of serious injury to the car and driver. Attempts to use a roadster-type car on a dirt track have not been successful. The following represents the number of National Championship races, other than the Indianapolis 500, conducted on paved tracks from 1958 through September 18, 1965, and the awarded prize money. Prize money
Number
Number of
awarded
of paved
races on
to all
Year
tracks
paved tracks
participants [4]
1958
3
5
$114,923.00
1959
4
6
160,080.00
1960
3
5
141,865.00
1961
3
5
150,156.00
1962
3
6
174,544.00
1963
3
6
211,293.00
1964
4
8
281,206.23
1965
6
10
356,108.00
During the taxable years in question, the Demler Special neither raced in, nor attempted to qualify for, any national championship race other than the Indianapolis 500. Approximately 50 percent of the cars entered in the Indianapolis 500 do not participate in other national championship races. [5]
*179 Since 1958, petitioner has been a member of and has attended every meeting of the National Champion Car Owners Association (NCCOA), which is comprised of a group of national championship car owners who seek to further their common interests, the principal one of which is increasing the prize money available to them for the various events, by applying pressure to the various sponsoring groups such as the United States Auto Club and the Speedway Corporation. The Corporation reported gross income and claimed expenses (including payments to drivers and mechanics and depreciation) with resulting net income or loss from its racing activities for its fiscal years 1960 through 1965 as follows: F/y/e
Gross
Net income
January 31
income
Expenses
or (Loss)
1960
$12,330.18
$18,858.86
($ 6,528.68)
1961
24,475.00
43,707.10
( 19,232.10)
1962
10,560.00
22,395.03
( 11,835.03)
1963
4,347.00
21,836.39
( 17,489.39)
1964
7,259.05
19,789.53
( 12,530.48)
1965
24,568.56
23,894.39
674.17
The following shows the comparison of the claimed expenses of the Corporation (including depreciation) and the net amount of prize money which would have been realized *180 if the Demler Special had finished first, second, or third during the taxable years involved herein (after the deduction of the percentage which would have been payable to the driver and chief mechanic): [6]
Claimed
F/y/e
First
Second
Third
expenses
1960
$53,425
$19,900
$16,188
$12,496
1961
55,000
24,013
12,175
31,382
1962
47,190
26,700
13,250
16,890
Petitioners' taxable income for their fiscal years ending January 31, 1959, 1960, 1961, and 1962 was as follows: F/y/e
As shown
As adjusted
January 31
on return
by respondent
1959
$19,807.56
*
1960
26,193.84
$38,513.68
1961
12,135.70
34,589.86
1962
18,204.67
33,143.98
At the end of his taxable year January 31, 1960, petitioner owned a 1955 Buick station wagon, which had been purchased in 1955; a 1957 Cadillac, which had been purchased *181 in February 1957; and a Pontiac station wagon purchased in January 1960. Petitioner owned no other cars. In February 1960 petitioner sold his 1957 Cadillac, and in April 1960 he purchased another Cadillac. For each of such years, petitioner used all three cars in his business. Respondent allowed a deduction for only 50 percent of the depreciation on the 1960 Cadillac. For fiscal year 1960, petitioners, through their representatives, J. D. Elliott & Co., certified public accountants, requested and received an extension of time until July 15, 1960, to file petitioners' individual income tax return which was otherwise due on May 15, 1960. The said return was actually filed on August 12, 1960. For the fiscal year 1961, petitioners' return was due on May 15, 1961. On or about May 11, 1961, petitioners, through the same representatives, requested an extension of time to July 15, 1961 to file said return. On or about May 15, 1961, petitioners' application was denied by the district director of internal revenue. On July 15, 1961, petitioners mailed said return, addressed to the district director. Petitioner spent the month of May 1960 and 1961 in Indianapolis, preparing his car for entry *182 in the Indianapolis 500. In the months prior to May, petitioner spent many hours getting the car ready for the race and was also engaged in heavy planting and farm work in April and July and in extensive work in his vinegar business from June through September. Ultimate Findings of Fact Petitioner at all times pertinent intended to realize profit from his auto racing activities. During the taxable years involved herein, the Corporation was engaged in the trade or business of auto racing. During the taxable years involved herein, the 1960 Cadillac owned by petitioner was used for business purposes to the extent of no more than 50 percent. Petitioners' failure to file timely returns for the fiscal years ended January 31, 1960 and January 31, 1961 was not due to reasonable cause. Opinion 1. Auto Racing Petitioner asserts that the auto racing activities of the Corporation constitute a "trade or business" within the meaning of section 162 [7] of the Internal Revenue Code of 1954. Respondent, on the other hand, insists that the Corporation was not engaged in a trade or business but was merely a conduit through which petitioner could continue an activity *183 that he had enjoyed as a hobby during his earlier years. Because resolution of this issue inevitably turns upon the facts as revealed by the particular record of each case, no useful purpose is served by a detailed analysis of the myriad of prior decisions. See Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Margit Sigray Bessenyey, 45 T.C. 261, 274 (1965). The situation is further complicated where, as is the case here, the "more sportive segment of the citizenry and their characteristic exploits" are involved. See Weir v. Commissioner, 109 F. 2d 996, 997 (C.A. 3, 1940), modifying 39 B.T.A. 400 (1939), certiorari denied 310 U.S. 637. *184 The key element is the state of mind of the petitioner. Did he in good faith expect to make a profit? As long as the activities are entered into and carried on in good faith for the purpose of making a profit, the business need not realize an immediate profit. Nor must the expectation of profit be reasonable, although the prospect of eventual profit has a bearing on the taxpayer's good faith. Lamont v. Commissioner, 339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; International Trading Co. v. Commissioner, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court; Doggett v. Burnet, 65 F. 2d 191 (C.A. D.C. 1933), reversing 23 B.T.A. 744 (1931); Henry P. White, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939. An activity can still constitute a "trade or business" even though the taxpayer also derives pleasure *185 therefrom. "Success in business is largely obtained by pleasurable interest therein." See Wilson v. Eisner, 282 Fed. 38, 42 (C.A. 2, 1922); see also Thacher v. Lowe, 288 Fed. 994, 995 (S.D.N.Y. 1922). Similarly, the mere fact that the activity was previously carried on as a hobby does not preclude a finding that it has become a "trade or business." McLean v. Commissioner, 285 F. 2d 756 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court. Prior status as a hobby may be a handicap to a taxpayer in proving the good faith of his asserted expectation of profit, but it does not constitute a shackle from which there is no escape. Nor are continued losses determinative, although they too may be evidence bearing on the taxpayer's good faith. See Margit Sigray Bessenyey, supra, at p. 274; DuPont v. United States, 234 F. Supp. 681, 686 (D. Del. 1964). Petitioner was experienced in the field of racing, having owned and raced a car on the West Coast in earlier years and having kept abreast of the innovations in racing by his active participation in the pit at various races, [8] as well as being a spectator at many others, *186 and his visiting regularly the Offenhauser plant. He designed the Demler Special himself. From 1958 on, he annually devoted long hours applying his skills to the preparation of the Demler Special for the Indianapolis 500 and to the race itself. Petitioner had all the marks of a professional. While such a characterization is not, in and of itself, determinative, the degree of the taxpayer's skill and experience and of his participation, bears directly on the question of good faith. [9]
In 1958, the only year petitioner entered the car in the Indianapolis 500 as an individual, he placed second, 29 seconds behind the first-place car. In later years, with the Corporation owning it, the Demler Special took a third and a fifth. There is no question that a first-place finish in any of the three years before us would have meant a large profit. "The winning of a single race * * * might at any time convert steady losses into a net profit, and make it a successful *187 business." See George D. Widener, Et Al., 8 B.T.A. 651, 658 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929). Moreover, in two of the three years before us the Corporation would have realized a profit [10] from a second-place finish and in one year from a third-place finish. Finally, it is noteworthy that in fiscal 1965 the Corporation realized a profit - albeit small - from a fourth-place finish. Respondent claims that the fact that the Demler Special did not enter races other than the Indianapolis 500 proves lack of intention to make a profit. We should not substitute our business judgment for that of petitioner. [11] In any event, petitioner has shown us good reasons for not entering other races, among which are the custom design of the car which restricted it to paved tracks and the additional time involved in preparation when considered with petitioner's other business activities. *188 Nor do we agree with respondent that the proceeds of the sale of land in 1957 should simply be viewed as supplying petitioner with the wherewithal to pursue a hobby. Petitioner was not a rich man indulging himself - even taxpayers of wealth have been sustained in their efforts to convert sportive exploits into a trade or business. [12] We view the proceeds of the 1957 sale as providing petitioner with the necessary capital funds to make his entry into the auto racing business meaningful.
We see no need to delineate the exact point in the wide spectrum between contempt or indifference to profit, on the one hand, and the sole compulsion of profit, on the other, which divides a hobby from a "trade or business." Where the critical factor is a person's *189 intent or motive, there is a twilight zone which defies precise definition. Attempts to evolve a computer-like standard under such circumstances tend to compound rather than to dispel the confusion. See Lamont v. Commissioner, supra, at p. 380, n. 4; cf. Malat v. Riddell, 383 U.S. 569 (Mar. 21, 1966). It is enough if the taxpayer is found to have had a profit motive to a degree sufficient to convince the trier of the facts that he was carrying on a "trade or business." [13]
We hold that the Corporation was engaged in a trade or business and that the requirements of section 162 have, therefore, been met. 2. Subchapter S In view of our finding that the Corporation was engaged in a trade or business, we need not decide whether the Subchapter S election would entitle petitioner to deduct expenses not otherwise deductible by the Corporation. See DuPont v. United States, supra, 234 F. Supp. at p. 683. *190 3. Depreciation Petitioner asks that we find that he was entitled fully to depreciate the Cadillac instead of the 50 percent depreciation which respondent has allowed. Inasmuch as petitioner's two station wagons (a 1955 Buick and a 1960 Pontiac) were, by his own testimony, fully used in the trade or business, we find it difficult to believe that petitioner used his only other automobile as much for business as he claims. We hold petitioner has failed to justify greater than a 50 percent allowance. 4. Delinquency penalty Petitioner asks that section 6651, providing for a penalty for failure to file a timely return without reasonable cause, be declared inapplicable on the basis of the facts of this case. [14]
*191 The main thrust of petitioner's argument against the application of the section 6651 penalty is the alleged difficulty in assembling data and information necessary for the preparation of the returns. This allegation, in turn, rests on the assertion that during the period April through July, and even through September, petitioner was extremely busy and was away from home a considerable portion of the time. We are unimpressed. If petitioner's position in this regard were accepted, thousands of taxpayers would be able successfully to plead "reasonable cause" for failing to file timely returns. The cases relied upon by petitioner are clearly distinguishable. With respect to the fiscal year ended January 31, 1960, petitioners' accountant testified that he believed that a 90-day extension of time to file had been applied for and granted. However, only a 60-day extension was in fact applied for and received. That extension expired on July 15, 1960. The accountant further testified that he did not discover his alleged error until after the 60-day period expired but he did not testify as to how long after July 15 his discovery took place. The return was not actually filed until August 12, 1960. The *192 accountant stated that he did not consider the delay "too serious because the return in fact showed a substantial overpayment which would not incur any further penalties." In point of fact, the return did not show an overpayment; on the contrary it showed an additional payment due of $2,343.35 out of a total tax shown thereon of $7,743.35. Petitioner testified that he asked his accountant to get an extension and that he thought his accountant had done so. He further testified that he realized that the extension was insufficient, but he did not fix the time of such realization. At no point did he testify that he thought he had a 90-day extension or that his accountant had so informed him. Indeed, there is evidence that petitioners received the actual extension directly from respondent. The return which petitioners actually filed on August 12, 1960 had attached to it a letter dated July 28, 1960 and signed by petitioner, stating: "Due to a misunderstanding, the extension covered a period of sixty days, whereas a ninety day request was intended. This change was not noted until just recently, as I am away from home a good deal." No mention was made of the role of the accountant or any *193 alleged reliance on the part of petitioners. Even if we accept all of the testimony of petitioner and his accountant at face value, petitioners have failed to sustain the burden upon them to overcome the presumption of correctness which attaches to respondent's determination. We hold petitioners are liable for the penalties asserted under section 6651(a). Decision will be entered under Rule 50. Footnotes
1. With the exception of certain war years, it has been held each year since 1911.↩
2. Such conditions involve the size of the gate receipts and other sources of income such as the proceeds from closed circuit telecasts of the race in 1964 and 1965.↩
3. In 1962 and 1965, the Demler Special was damaged in the qualifying heats and was unable to participate further.↩
*. The record does not show arrangement with chief mechanic in 1961, 1962, and 1965. Petitioner testified, however, that such persons usually receive 10 percent of the winnings and that was, in fact, the arrangement for 1961 and 1962. In 1965, petitioner, who is licensed as such, acted as his own chief mechanic.↩
4. It should be noted that any one car could win only a portion of these amounts, which is not revealed by the evidence.↩
5. Some individual car owners design their cars for use exclusively in the Indianapolis 500. One such owner, Lou Moore, finished first in 1947, 1948, and 1949 and did not race his car in any national championship race other than the Indianapolis 500.↩
6. It should be noted that the prize money does not include amounts of qualifying prize money which might have been won nor additional monies which might have been derived (in the event that the Demler Special had placed first) from displays, exhibitions, and product endorsements.↩
*. Not audited by respondent.↩
7. All references are to the Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
8. Petitioner was a licensed chief mechanic. ↩
9. The elements can be a sword as well as a shield in that, in some situations, they will clearly indicate that the taxpayer's asserted expectation of profit is hardly worthy of belief.↩
10. This is after taking into account depreciation which petitioner took on an accelerated basis. We express no opinion as to the extent to which depreciation (and particularly the method used for tax purposes) should be taken into account in determining "expectation of profit."↩
11. We note that about 50 percent of the entrants in the Indianapolis 500 fail to enter other races.↩
12. Dupont v. United States, 28 F. Supp. 122; George D. Widener, Et Al., 8 B.T.A. 651 (1927), aff'd, 33 F. 2d 833 (C.A. 3, 1929); Cornelius Vanderbilt, Jr., T.C. Memo. 1957-235↩.
13. Kirkpatrick, J., in Dupont v. United States, 28 F. Supp. 122↩ (D. Del. 1939), reflected this point of view with refreshing candor when he stated at p. 124: "No one test has ever been put forward as completely decisive. What appeals to one judge may not appeal to another."
14. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩